15875

PAGE *ET AL.* v. LEWIS *ET AL.*

(39 S. E. (2d), 787)

*Messrs. Wright & Burroughs,* of Conway, and *Woods & Woods,* of Marion, for Appellants,

*Messrs. Epps & Epps,* and *Cordie Page,* all of Conway, for Respondents,

*Messrs. Norton & Norton,* of Marion, and *Suggs & McCutcheon,* of Conway, for Intervenor,

October 17, 1946.

MR. CHIEF JUSTICE BAKER delivered the majority opinion of the Court.

We have made a diligent study of the record in this case, and it is our opinion that no other conclusion can be reasonably reached on the factual situation than that arrived at by the Honorable L. D. Lide, Circuit Judge, whose able decree is hereby adopted by a majority of the Court as its opinion, and will be reported.

MESSRS. ASSOCIATE JUSTICES FISHBURNE and TAYLOR concur. MR. ASSOCIATE JUSTICE OXNER concurs in result. MR. ASSOCIATE JUSTICE STUKES dissents.

MR. ASSOCIATE JUSTICE OXNER (concurring in result):

After carefully reading and considering the voluminous record in this case, I am satisfied that the Circuit Judge reached the proper conclusion, although I am not in entire accord with all of his findings of fact. A discussion of these minor points of difference would serve no useful purpose. I, therefore, concur in the result of the opinion of the Chief Justice.

### ORDER OF JUDGE LIDE

This case is now before the court for a decision on the merits, and was argued by counsel for the respective parties upon the very voluminous testimony heretofore taken,

the testimony of the original plaintiff having been taken before the clerk of court and the remainder of the testimony having been taken before the master. In addition to very full oral arguments counsel for the respective parties have filed with me briefs which were necessarily quite elaborate and discussed the case in great detail, and I have endeavored to give them all my careful attention, consideration and study.

This litigation has already accumulated some history of record. The action was originally commenced on October 8, 1941, upon a complaint by J. M. Lewis to set aside certain deeds of conveyance of real estate and certain assignments of mortgages upon the grounds of mental incompetence, undue influence and the like. The defendants first interposed a demurrer to the complaint upon the ground that the allegations thereof showed that the plaintiff had no legal capacity to sue, in that, he was suffering from such physical and mental disabilities as to render him incapable and unfit to transact business. And this demurrer was sustained by the court with leave to the plaintiff to amend. Upon the service of the amended complaint the defendants again demurred and on substantially the same ground, but the Court held that "mental infirmity" admits of wide variety of conditions, of varying degrees of severity, depending upon the individual case, and a person may have sufficient mental capacity to transact some kinds of business and not others, and hence the amended complaint was not demurrable. The order of the circuit court overruling the demurrer was affirmed by the Supreme Court. See *Lewis v. Lewis,* 199 S. C., 490, 20 S. E. (2d), 107.

Thereafter, to wit, on December 14, 1942, J. M. Lewis, the original plaintiff, died intestate, at the age of about 84, and it was alleged that he left as his only heirs-at-law a number of nephews and nieces of the whole blood, besides two half-brothers, and a motion was duly made to continue the action in the names of the heirs-at-law of the original plaintiff, together with his administrator, while an adverse mo-

tion was made by the defendants to declare the suit abated and dismissed. The Court having handed down an order denying the motion made in behalf of the defendants and continuing the cause in the names of the substituted plaintiffs, an appeal was taken to the Supreme Court, but the order was affirmed upon the ground that an action of this character survives and does not abate. See *Page v. Lewis,* 203 S. C., 190, 26 S. E. (2d), 569.

Later by permission of the court, the proceedings were further amended by adding as a party defendant one Joe Charlie Lewis (otherwise known as Joe Morgan Lewis) who has answered, joining in the prayer of the original complaint but alleging that he, and not the substituted plaintiffs, is the sole heir-at-law of the original plaintiff. However, the issue as to who are the lawful heirs of J. M. Lewis is not now before the Court.

It should also be stated that the amended complaint alleges among other things that the defendant J. T. Lewis in the exertion of undue influence upon the original plaintiff, J. M. Lewis, resulting in the execution of the deeds and assignments in question, falsely and fraudulently represented that the said plaintiff was about to be sued for sums of money amounting to $37,000.00, which would result in his financial ruin, and that he was thus induced in his enfeebled mental and physical condition so to convey his property; and that the said defendant also then promised and agreed to reconvey the property on demand, but thereafter failed and refused so to do. And the answer of the defendant J. T. Lewis, in addition to a general denial of the material allegations of the amended complaint, also alleges affirmatively that the deeds and assignments were free and voluntary and were made for good and valuable consideration, and that a life estate was reserved in the real property. There is also a plea "by way of set-off" alleging that certain payments were made by J. T. Lewis for the benefit of J. M. Lewis, but except as to one item the amounts thereof are not given.

Francis Lewis, a brother of J. T. Lewis, is made a party defendant for a limited purpose as will be explained toward

the end of this decree, and hence where reference is hereinafter made to the *defendant,* it will be understood that J. T. Lewis is meant, unless otherwise stated.

In the consideration of this case the record is so extremely elaborate and extended that I shall not try to discuss every detail of the evidence, but will endeavor to refer to what seem to me to be the more important portions thereof. Preliminary to doing this, however, I shall attempt to make a statement of the background of the case, calling attention to certain matters in dispute between the parties.

The original plaintiff in this cause, James Morgan Lewis, late of Horry County, was a man of very limited education, although not illiterate. He was primarily a farmer, but evidently had great faith in the prospective value of real estate, and by means of extraordinary and long continued industry, thrift and even parsimony, accumulated what might be termed a landed fortune. Most of these tracts or parcels are situate in Horry County, but there is also a group thereof situate in Marion County. The only evidence of the value of this property, as shown by the record, seems to have been that given by Cordie Page, Esq., of the Conway bar, who was a nephew of the whole blood of Mr. Lewis (except the testimony of Mr. Holbert hereinafter mentioned). Mr. Page testified that the Marion County property was worth at the time in question perhaps as much as $15,000.00 and the Horry County Property was easily worth $50,000.00, which would make a total of $65,000.00. And upon the death of Mr. Lewis, Mr. Page filed a petition for the issuance of letters of administration in the Probate Court of Horry County, and certain of these proceedings are in evidence before me. This petition values the real estate at $75,000.00, at that time, which would appear to be probably a fair estimate of the actual value thereof.

Mr. Lewis and his wife, who is sometimes referred to in the testimony as Mrs. Izzie Lewis or Aunt Izzie, lived together until her death on December 14, 1938, for a period of about 55 years, and their country home was about as

bare and simple as could well be imagined when we consider the financial worth of Mr. Lewis. They apparently had none of the luxuries of modern existence, and scarcely any of the ordinary comforts, but lived in rather primitive style. For example, Mrs. Lewis did the cooking in the fireplace for nearly all her life.

The illness and death of Mrs. Lewis appear to have been the beginning of a series of events resulting in the transactions involved herein and hereinafter set forth in detail. After she had been in the hospital for a time she was brought back to her home and a nurse was procured for her in the person of Mrs. Eva Cribb, who was her niece. And in the latter days of her life Mr. and Mrs. Cordie Page alternately stayed at the home, manifestly for the purpose of rendering such assistance as they could, and they continued in the home for some time after the death of Mrs. Lewis, and Mrs. Cribb remained there for a while longer. According to the contention of the plaintiffs the death of Mrs. Lewis was such a profound shock to Mr. Lewis as to impair his mental and physical condition, although this is denied by the defendant. At all events, it appears that in the course of a short period Mr. Lewis became offended with Mr. Page and requested him and his wife to leave, even accusing Mr. Page of taking Eva (Mrs. Cribb) away from him, for seemingly Mr. Lewis had become jealously enamored of her. And not very long after this Mrs. Cribb also left his home. Mr. Lewis' testimony hereinafter quoted will show that he ascribed this change in his attitude toward Mr. Page (his full nephew and to whom he had previously been very much attached) to derogatory rumors and reports chargeable to the defendant.

Thereafter, to wit, on August 3, 1939, Mr. Lewis sustained a very serious automobile accident, causing a fracture of the skull and other injuries of so grave a character that he remained in the hospital for a period of 70 days. And it is contended by the plaintiffs that this accident resulted in further and more serious impairment of his mental

faculties, as well as his physical health, for he was in the hospital at rather frequent intervals during the remainder of his life. After his return from the hospital on this occasion he spent a large part of his time, during a considerable period, at the home of his half-brother, S. P. Lewis, referred to frequently as Sweet Lewis, which was about 300 yards from his own home; and he was attended during this period of convalescence principally by Mrs. Lou Lewis, the wife of S. P. Lewis, and also perhaps by other members of that family. And at. that time or soon thereafter the defendant James Thomas Lewis (a son of S. P. Lewis), who will sometimes hereinafter be referred to as Tom Lewis, became rather intimately associated with his half-uncle, who will some time hereinafter be referred to as Morgan Lewis. The elder Mr. Lewis was not able to drive a car, and Tom Lewis drove him around considerably, using during most of the time a new automobile bought in March, 1940, by the former from Byars Motor Company in Marion, trading in his old car. Indeed the new car appears to have been in more or less constant use by Tom Lewis in driving Morgan Lewis around on various missions.

After the break in relations between Morgan Lewis and his nephew Cordie Page, Esq., who had formerly transacted all of his law business, Mr. Lewis visited him at his office and demanded and received from him a will executed many years before that time in which Mr. Page was the chief beneficiary, this will having been drawn by the late R. B. Scarborough, Esq., a distinguished member of the Conway Bar. Mr. Lewis then employed W. O. Godwin, Esq., of the Conway bar, as his attorney.

Coming down to the transaction which is the basis of the instant action: J. T. Lewis drove his half-uncle, J. M. Lewis, to the office of Mr. Godwin in Conway on August 8, 1940 (or perhaps it was August 9, 1940); and in the presence of J. T. Lewis, J. M. Lewis executed to him two certain deeds of real estate, to wit, a deed for 42 separate tracts or lots of land situate in Horry County, and another deed for 11

separate lots or tracts of land situate in Marion County. Each of these deeds recites a consideration of the sum of $5.00 and "love and affection", and the Horry County deed contains a clause stating that it is intended to convey all other real estate owned by the grantor in that county and which had not theretofore been sold or conveyed; and a like clause is contained in the Marion County deed. Hence the effect of these two deeds was to convey all of the real estate of the grantor, save and except a few small tracts which on the same day were conveyed by J. M. Lewis to the other children of S. P. Lewis, respectively; and there was also a tract conveyed to J. T. Lewis and W. O. Godwin, as trustees, for the benefit of a certain church, the ultimate fee thereof to vest in J. T. Lewis.

■ Each of the two deeds before us conveyed a plain fee simple title in the granting clause thereof. The *habendum* clause likewise was in fee simple, and this clause and the general warranty clause were in the same paragraph, and between the two clauses these words occur: "excepting and reserving however a life estate to the grantor herein." The two deeds are identical in this respect. It is therefore quite apparent that if we apply the established rule of construction to these deeds no life estate was in legal effect reserved, because both the premises and the *habendum* conveyed a fee simple without qualification, and the estate thus granted could not be cut down by subsequent language found in the deeds. *Hewitt v. Hewitt,* 187 S. C., 86, 196 S. E., 541. Yet we cannot escape the conviction that when the language of these deeds is considered in its entirety it was manifestly the intention of the draftsman that a life estate should be reserved. However, as will hereinafter appear, this defect in the deeds may be deemed to have contributed to the unfortunate character of this extraordinary transaction.

In addition to the execution of these deeds there were transferred by J. M. Lewis to J. T. Lewis, without any reservation, certain mortgages of real estate and the indebtedness thereby secured amounting in the principal sum to

approximately $5,000.00. And even the balance in the bank to the credit of J. M. Lewis, the same being $344.59, was turned over to J. T. Lewis by him. And while it is not mentioned in the complaint, the evidence shows that about this same time, or shortly thereafter, the title to the automobile belonging to J. M. Lewis was put in the name of J. T. Lewis and the possession thereof was delivered to him. Indeed, it appears from the evidence that all of his real property, with the minor exceptions above mentioned, and almost all of his personal property of any substantial value whatever was conveyed by J. M. Lewis to a person who, although related to him by the half-blood, was not even a prospective heir-at-law, and is not now an heir-at-law. And there was no actual consideration whatever for these conveyances or transfers.

Although the real estate deeds purported to reserve a life estate to the grantor it appears from the petition for letters of administration that upon the death of J. M. Lewis on December 14, 1942, his only personal propery of any substantial value was a government bond in the principal sum of $500.00, which seems not to have been included in the transaction with J. T. Lewis for the reason that it was then in the possession of Mr. Page. The total personal assets stated in the petition amount to $660.00, and the administrator's bond was fixed at $1,000.00, while claims filed against the estate principally for personal services rendered the intestate, some of which was in his latter days, amount to over $6,500.00. Admittedly, if these claims or any substantial portion thereof is held to be valid, *the estate is quite insolvent.*

■ While the testimony upon most of the vital issues in the case is, as is usually to be expected, more or less in conflict, my conclusion, after thorough study and deliberation, is that the preponderance of the evidence is definitely to the effect that the transaction involved was due to and proximately caused by undue influence exercised upon J. M. Lewis by or in behalf of his half-nephew, J. T. Lewis, and also that

J. M. Lewis was to a marked degree mentally incapacitated, and that such mental incompetence was a contributing factor to the effect of the undue influence aforesaid. Even if we assume that such mental incompetence standing alone would not be sufficient to invalidate the transfer of the property involved, for Mr. Lewis no doubt had sufficient mental capacity to execute instruments in the ordinary routine of business, it is quite apparent to me that he did not have sufficient mental grasp to understand the effect of the instruments signed divesting him of substantially all his property accumulated over a period of half a century and more, and that what he did was superinduced by fraudulent representations.

Referring first to the matter of mental incapacity, the evidence of L. B. Blackburn and H. C. Lewis, who were agents of J. M. Lewis in the collection of rents and the making of repairs to certain rented property in the counties of Marion and Horry, respectively, is highly persuasive, for these men, both of whom evidently enjoy the highest reputation for integrity, were intimately associated with Mr. Lewis for a long period of time and necessarily came into repeated contact with him, which in itself distinguishes their testimony from that given in behalf of the defendant by a number of witnesses whose transactions and relations with Mr. Lewis were necessarily more or less casual and infrequent. It should be stated here that H. C. Lewis was not related to J. M. Lewis.

The testimony of Mr. Blackburn on the question of mental incompetency is very significant indeed. He says that Mr. Lewis had apparently begun to fail before his wife died, "and from then on he seemed to fail much faster and after he had that accident, why, he was childish, too." Mr. Blackburn further said with reference to Mr. Lewis' mental condition that he was absent-minded and that he would frequently forget what he was talking about. Quoting from Mr. Blackburn's testimony, he says:

"I have seen him go into the office—on one occasion the old fellow said he had been to Columbia, he had no money

and tried to get in the asylum. My wife gave him a check; he asked her to get it cashed for him. Mr. Jolly went out, that works for me, and got it cashed and brought it back and they were giving him the money and he wanted to know what they were giving him the money for."

Mr. Blackburn testified that he did not think he was mentally capable to execute the deeds in question, and that he would suppose in view of his feeble physical and mental condition that he "would have been easily influenced."

The testimony of H. C. Lewis was in general to the same effect, and he testified that after the death of Mr. Lewis' wife he did not take very much interest in his business and that after the automobile wreck "he had a whole lot less interest in his business. Wanted somebody to guide him in his business altogether." This witness also said, "Well, he couldn't carry on a legal conversation, what you call a legal conversation, because he would start off on one subject and was liable to switch off on something else." And in answer to a question as to his mental capacity at the time the deeds were executed the witness said, "No, sir; I wouldn't qualify him as capable."

It is true that this witness acted under a power-of-attorney executed by J. M. Lewis some time after the deeds had been made, but it appears that this power-of-attorney was given because it was alleged or claimed that J. T. Lewis had attempted to exercise some authority over the property, and his right to do so had been questioned by J. M. Lewis.

Dr. W. E. Lester, a highly competent physician residing at Mullins, treated J. M. Lewis at the Mullins Hospital for five days in August, 1942, giving particular attention to his mental condition. And this physician testified that his patient had "general arteriosclerosis," which is hardening of the arteries; that his mental condition was changeable, and that while at times it was fair, at other times it wasn't so good. He further testified that when Mr. Lewis was excited his talk would wander from one subject to another,

and that his mental condition was no doubt aggravated by his worries relating to his property.

This witness also testified as follows:

"Q. Doctor, did he, or not, have any obsession with reference to women?

"A. Yes, he did; he did talk about it. He had the opinion that he was as virile as he was when he was young. He did not talk about any particular woman."

\* \* \*

"Q. Doctor, did that subject affect his mental condition?

"A. That is a fair sign of senility. Delusion also goes along with it."

The portion of the testimony of Dr. Lester just quoted is quite significant in view of the apparent infatuation of old Mr. Lewis for his wife's niece, Mrs. Eva Cribb, and the unfounded charges made against Mr. Page in relation to her. It is also significant, in the light of some of the testimony, that Mr. Lewis in his old age and after the death of his wife apparently had some obsession in regard to his masculine powers.

I do not overlook in this connection the testimony of a number of witnesses in behalf of the defendant relating to various transactions where Mr. Lewis signed certain written instruments, prepared for his signature and relating to routine matters or matters concerning which there was no reasonable ground for misunderstanding. And I have carefully considered the testimony strongly relied upon by the defendant given by Mr. James R. Holbert, a public accountant in Conway, who made the income tax returns for Mr. Lewis for the years 1939 and 1940, stating that he acquired his information from Mr. Lewis and also from copies of his previous returns. It was the opinion of Mr. Holbert that his mental condition was good, yet admittedly Mr. Lewis gave him as the persons who would inherit his property in the event of his death the names of his half-niece and half-nephews (children of his half-brother S. P. Lewis)

and their children, entirely disregarding his half-brothers and the host of his nieces and nephews of the whole blood, to say nothing of the intervenor, in this action, Joe Charlie Lewis (otherwise know as Joe Morgan Lewis) who seemingly claims to be his sole heir-at-law as being his son by some marriage prior to that of his marriage with Mrs. Izzie Lewis hereinbefore referred to; although this is denied by the plaintiffs.

Mr. Holbert also testified that in the return as prepared by him for the pear 1940 there was included a profit of $950.00 upon a timber transaction which occurred in October, 1940, about two months *after* the deeds had been signed, which would indicate that J. M. Lewis did not understand the transaction with J. T. Lewis, for there can be no doubt that if J. T. Lewis acquired the property under and by virtue of the deeds, with a life estate actually reserved to J. M. Lewis, the latter could not be charged with any profit on the timber transaction save with regard to the estimated value of the life estate as related to the timber. This sale of timber in October, 1940, was made to Canal Wood Corporation covering timber on certain of the Lewis lands, and seems to have been negotiated with J. M. Lewis; and the testimony of the agent of the timber purchaser was, in substance, that Mr. Lewis displayed good trading ability in that he fixed a full price for this timber, the amount thereof being $4,000.00. The transaction was completed and all parties concerned signed the deed. Included in the lands covered thereby was a tract conveyed to Lucile Lewis, the daughter of S. P. Lewis, at the same time the deeds were made to J. T. Lewis, and her share of the proceeds was $500.00. At the time the timber sale was made she was an infant and it was necessary to procure an order of court for the conveyance of her interest. Of the purchase price $500.00 was deposited to the credit of J. T. Lewis, as trustee for Lucile Lewis, and the net balance of the money, to wit, $3,487.00, was deposited to the personal credit of J. T. Lewis. No allowance whatever seems to have been

made on account of the supposed life estate of J. M. Lewis, although Mr. Lewis says that he told Tom that he wanted $500.00 of the money, which seems to indicate that the deeds were at least to some extent treated in accordance with their strict legal construction, to-wit, as conveying the property to J. T. Lewis without any reservation of a life estate.

But perhaps an even more significant circumstance relating to the timber transaction is that the agent of the timber purchaser, Mr. G. C. Berry, testified that Mr. Lewis told him that he had disposed of his property *"but he had reserved his timber."* It may be reasonably inferred from this testimony that Mr. Lewis understood that notwithstanding the execution of these deeds he still had the control of his property, and that the reservation of a life estate assured him this control and confirmed his right to require a reconveyance. In other words, he was not informed and did not understand just what was the effect of a reservation of an estate for life. And when he was questioned on his cross examination as to retaining a life estate he said: "I meant to do that in all of it. *To get it back when I wanted it."* (Emphasis added.)

The testimony of the original plaintiff, J. M. Lewis, himself was, in the exercise of prudent precaution, taken soon after issue was joined, because of his advanced years and precarious condition. This testimony was taken before Mr. Graham, the clerk of court, who says that Mr. Lewis seemed to understand it, and when it was read over made few changes, and I do not question the good faith of Mr. Graham's statement. But I think a mere reading of the whole testimony of Mr. Lewis is sufficient to demonstrate considerable mental weakness on the part of this aged man. However, the testimony also shows that there was no effort or intention on his part to make any untrue statement, or to testify to anything merely in the furtherance of his own interests. His character as a truthful man is not only presumed, but there is specific testimony on the part of certain

witnesses for the defendant and the defendant himself, that he was a truthful man.

I think we may reasonably assume that Mr. Lewis had no idea what the phrase "undue influence" means, and yet his testimony portrays in a crude but vivid way the exercise of such influence upon him by Tom Lewis and by Mrs. Lou Lewis, Tom's mother.

The following excerpts from his testimony will illustrate the statements just made.

"Q. How did you happen to change attorneys at about the time your wife died or some time shortly afterward?

"A. Well, I think people's talk was the biggest thing.

"Q. I will ask you whether or not persons had said things derogatory to Mr. Page?

"A. Yes, to the woman, too.

"Q. And what woman do you refer to?

"A. Eva Cribb, that I answered just now waited on my wife, we carried her from the hospital here. She stayed with us until some time after my wife died.

"Q. As a result, now who, Mr. Lewis, gave you the derogatory reports concerning Mr. Page and the lady who was keeping house for you?

"A. Well, course I didn't go nowhere else but Sweet Lewis'.

"Q. Well, what members of his family had most to say to you about that and made these reports?

"A. I don't know but what his wife was the best talker and Tom was with me every day.

"Q. Did Tom from time to time tell you of these adverse reports on Mr. Page?

"A. Often, me and Tom never talked a very great deal in the house, he would come to see how I was, when he got in the car he would tell me loads of things and was very willing to do anything for me."

\* \* \*

"Q. Now, during the year 1940, did Mr. Tom Lewis bring you to the office of Mr. Godwin?

"A. He fetched me there a good many times."

*   *   *

"Q. Mr. Lewis, what purpose did you come to Mr. Godwin's office, on what business did you come on that day (the day the papers were executed)?

"A. Well, I don't remember what I called that day for, but they had been talking enough for me to, fact, Mr. Godwin told it took him three weeks to get me to sign one of them."

He further testified referring to Mr. Godwin and Tom Lewis:

"They talked it right there to me and before each other, set the plans."

He further said:

"The plan for me to turn it over to Tom to keep Cord from getting it."

And I also quote the following:

"Q. All right now, did either of these gentlemen, did Mr. Tom Lewis or Mr. Godwin, in the presence of Mr. Tom Lewis, make a statement to you to the effect that Mr. Cordie Page was about to sue you for $37,000.00?

"A. That was talked freely, yes.

"Q. Now, which one said it, and if, what did the other say, if anything?

"A. I don't know that I could get all they talked before me only this was the only way out of his getting what I got. Deed it over to Tom—there were times on the road when he would ride he would say he would do anything in the world for me. Certainly it was my stuff. I was taking care of it through him.

"Q. Now, did Mr. Tom Lewis or Mr. Godwin in his presence tell you at the same time that Mrs. Eva Cribb was about to sue you for $37,000.00?

"A. I don't know whether they done it together or not, but that was the information I was getting."

Mr. Lewis further said with reference to the deeds made:

"I gave it up to them to take care of me if they could. Tom and him."

He also testified as follows:

"Q. Now, I will ask you whether or not at that time you assigned to Mr. Tom Lewis a number of mortgages that you had?

"A. Well, I think I did. I just told them I would rather do anything to save something to live on. Tom was so good, said I would just do anything, it was to be mine, he was taking care of me.

"Q. Did he at that time, agree to convey this property back to you whenever this trouble was over?

"A. I think time and again, whenever I wanted it."

Mr. Lewis further stated that some of his tenants had paid rent to Tom, and a number of original receipts signed "J. T. Lewis" were introduced in evidence, the same being referred to in the complaint. He says that he didn't think he ever authorized Tom to collect this money.

Upon cross examination Mr. Lewis said quaintly and most significantly, referring to J. T. Lewis: *"I confidenced him with all I had"*.

This testimony of J. M. Lewis shows, I think, that reported threats of ensuing litigation, constantly and repeatedly brought to his attention (although false and fictitious), so preyed upon his fears in the weakened state of his mind as to deprive him of his free agency and to substitute the will of another for that of his own.

The testimony of Mrs. Jule Lewis and that of her husband, A. M. Lewis (son of the intervenor), tends specifically to corroborate the testimony of J. M. Lewis. Mrs. Lewis testified that on a certain occasion she heard J. T.

Lewis make a statement with reference to the transaction. I quote the following from her testimony:

"We were all sitting in the front room talking. He says 'Uncle Morgan has deeded us what he had'. Some of us said, 'We don't believe that'. He said, 'He did whether you believe it or not'; he said, 'We've got it and nobody else will ever get it'. We said, 'How come?' He said, 'Well, we hoodooed him and got it.'"

"Q. Said what? A. 'We hoodooed him and got it'.

"Q. What else did he say on that occasion? Do you remember anything? A. I think my brother asked him then, says 'Tom, what did you do to him?' He says, 'Well, we told him Cordie Page and Eva Cribb was suing him and the only way out was to make the deeds and he made the deeds', and says, 'Now, we got him sewed up, he can't never get it back'.

"Q. Was your husband there at that time? A. Yes, sir.

"Q. When he said that, did he say who helped him? A. I think my husband asked him who all and he said, 'He gave me the most of it', said 'He gave the rest of them just enough to get by', and he had the rest."

The testimony of A. M. Lewis is much to the same effect.

There was no denial or contradiction of the testimony of Mr. or Mrs. A. M. Lewis on the part of anyone, as shown by the record, and it stands unimpeached and uncontradicted. J. T. Lewis did not go on the stand again after this testimony was given, and has made no denial of the sworn testimony of these witnesses. Counsel for the defendant, however, earnestly argue that the testimony is so inherently improbable and biased because of interest, these witnesses having filed a claim against the estate, that no consideration should be given to the same by the court. However, as I have already indicated, the witnesses were not impeached in any manner whatsoever, and the evidence shows that they rendered such much needed personal service to J. M. Lewis

as they could and at a time when others had ceased to take any interest in him. It is true that the joint claim filed by them against the estate will hardly be paid if the transaction with J. T. Lewis is allowed to stand, although this claim contains in addition to personal services an item of amounts paid to a doctor for services rendered to J. M. Lewis, and also an item paid to a drug company for medicine furnished him—a man who had accumulated a fortune.

There was also some testimony along the same line as that of the witnesses just mentioned by Mrs. Addie Penney, a full niece of J. M. Lewis, which was not denied by J. T. Lewis; but I have given no particular weight to this testimony because it appears that Mrs. Penney was somewhat hard of hearing.

Further referring to the testimony in regard to mental infirmity, I have endeavored to consider all the evidence on both sides of this controverted issue, including such credible witnesses for the defendant as Dr. H. B. Holmes, the very capable physician who treated Mr. Lewis after the automobile accident, and L. L. Foxworth, the general manager of Byars Motor Company.

Dr. Holmes expressed the opinion that the automobile accident did not substantially impair the mental capacity of Mr. Lewis, but on cross examination he freely admitted that an old man who did not seem to know who were his closest kin probably had senile dementia; and further that Mr. Lewis when under his care was in a very serious condition arising from the automobile accident, and hence he was then interested "in his physical and not his mental attitude".

Mr. Foxworth made the trade with Mr. Lewis for the automobile later turned over to J. T. Lewis and testified that he "out-traded" him, and hence he considered his mental capacity quite good. But it seems to have been his lifelong characteristic to be a close or shrewd trader, so that while acting in this well-worn groove even physical and mental deterioration were not sufficient to destroy his ability in this

respect, the same having become almost second nature with him.

In the course of the oral argument before me counsel for defendant laid considerable stress upon the testimony of J. M. Lewis in the court proceeding taken to confirm the timber sale to Canal Wood Corporation in so far as it relates to the timber on the land conveyed to Lucile Lewis, then an infant, and I have given consideration to the same, in which Mr. Lewis is reported as saying that he had a life estate in all of the lands involved in the timber deal. I do not question in any way the good faith of this proceeding, but it is quite obvious that the unsigned testimony of Mr. Lewis does not contain the precise language used by him, because he is represented as using well-chosen words grammatically expressed—something quite beyond his powers, as will readily appear by reference to his testimony taken in the instant cause. The testimony in the timber proceeding, however, has no special significance one way or the other, as I view it.

Referring particularly to the matter of undue influence, it is earnestly contended in behalf of defendant that whatever effect the threats of litigation may have had upon Mr. Lewis, much of it at least came from Mr. Page himself, who claimed that his uncle owed him as much as $10,000.00, and who made some threat as to prospective litigation by two unnamed persons. There is indeed some evidence of such a threat, but I think the record definitely shows that this was made *some time after the deeds and transfers were executed to J. T. Lewis*. Mr. Page's own testimony is quite clear that the interview to which anything was said about litigation occurred in the latter part of 1940 or the early part of 1941, and that it was in the winter season. And as I construe it, the testimony of Mr. Godwin is substantially to the same effect. It will be remembered that there were two interviews between J. M. Lewis and Mr. Page, one occurring shortly after the break with Mr. Page when the old will was turned over by him to Mr. Lewis, and the other some time after the deeds were made when Mr. Godwin was present and demand

was made by Mr. Lewis upon Mr. Page for the bond in his possession and his wife's pocketbook; and it was at this latter interview when the threat of litigation was made. And Mr. Lewis himself testified that this occasion was, to use his own words: "Long, long since those papers have been made, yes, sir".

Perhaps, however, the defendants rely most strongly in this connection upon the testimony of Mr. Holbert to the effect that, in view of the very large amount of property Mr. Lewis had, which the witness estimated as being worth $250,000.00 or perhaps half a million dollars (a fantastic valuation), he advised him that in order that his estate might escape inheritance taxation he should make a *straight out* deed of all of his property to some of his relatives without reserving a life estate or any other reservation, relying solely upon their willingness to support him; and that this advice was given in the early part of 1940 when he was making up Mr. Lewis' income tax returns for 1939, but I do not think that this astounding advice was ever acted upon by Mr. Lewis or that it had anything to do with the transaction with J. T. Lewis. There isn't another word of testimony in the record that J. M. Lewis ever at any time made any statement whatever indicating that he was interested in having his estate avoid the inheritance tax. There is nothing even remotely suggestive of it in his own testimony. And J. T. Lewis in his testimony also makes no reference whatever to any such idea. Surely J. T. Lewis would have known about it, if that was the purpose of J. M. Lewis in making the conveyances; nor is there anything in the testimony of Mr. Godwin to the contrary, for obviously he was not attempting in the slightest degree to carry out such a plan as that which Mr. Holbert says he had proposed, for he put in both deeds language expressly purporting to reserve a life estate to the grantor; and it was the very heart of Mr. Holbert's scheme that no such reservation could be made.

I do not overlook the testimony, in substance, that Mr. Holbert made some examination of the deeds either before

or after they were executed. He said that he got word from Mr. Lewis to contact Godwin and Tom, but how such word was conveyed to him and how authentic it was does not appear, and there was no competent evidence thereabout. He further testified that Mr. Godwin called him over the phone to come over to his office and look at the deeds, but Mr. Godwin does not recall this. In fact, there is much contradiction between Mr. Godwin's testimony and that of Mr. Holbert in this connection. But the most amazing thing is that Mr. Holbert said that he looked at the deeds and found they were all right; that the only thing he was interested in was to ascertain whether or not a life estate was reserved, and he saw no such reservation therein, although it is difficult to understand how he could have even glanced at the material parts of the deeds without observing, *staring him in the face, the words*: "Excepting and reserving however a life estate to the grantor herein".

Mr. Holbert did not say, and I am sure he would not say, that his conclusion was based on any legal theory that the reservation did not conform to the technicalities of the law. I am fully persuaded that no idea on the part of Mr. Lewis of having his estate escape the inheritance tax contributed in any degree to the transaction involved herein.

It is further contended in behalf of the defendant that Tom Lewis was the favorite nephew or half-nephew of Morgan Lewis, and that indeed he was a namesake. It is true that to the extent of the name James he may have been a namesake of his half-uncle, but strangely enough, neither he nor his half-uncle was called by this name. It is also true that in a will executed many years ago a tract of land was devised to Tom by Morgan, but later this tract was conveyed by Morgan to Tom's father, S. P. Lewis. After the break with Cordie Page there were two wills drawn and executed by J. M. Lewis in which J. T. Lewis was the principal beneficiary. These wills, however, were of course revokable and were subsequently actually revoked.

I think the evidence does indicate that although Tom may not have been the favorite nephew or half-nephew of Morgan Lewis he was attached to him and had much confidence in him, and that he probably contemplated that some of his property might ultimately be given to him, but that this was clearly not the purpose of the conveyances and transfers in question.

Indeed, the words from the testimony of Mr. Lewis hereinbefore quoted, *"I confidenced him with all I had"*, show that he had the utmost confidence in Tom Lewis and this in large measure accounts for the ability of the latter to bring undue influence to bear upon the former. And I think it might reasonably be said that the evidence indicates that there was in fact a fiduciary relationship between J. M. Lewis and J. T. Lewis, and that the burden of showing that the transaction was free and voluntary, just and fair, ought to be held to rest upon the defendant rather than the plaintiffs, but I do not think it is necessary to a decision of this case so to hold.

Counsel for the defendant, however, rely in large measure upon the testimony of W. O. Godwin, Esq., in regard to the transaction now before the court, since, as they contend, Mr. Godwin did not represent J. T. Lewis, the grantee, but represented J. M. Lewis, the grantor, and that the latter had the benefit of the advice of his own counsel.

Let me say that I do not think the evidence is sufficient to warrant the conclusion that Mr. Godwin was guilty of anything in the nature of actual fraud; but he can scarcely complain that J. M. Lewis looked upon him as rather the attorney for J. T. Lewis than for himself. The rather extraordinary method by which his sizable fee was collected and paid adds to the confusion, for it was paid by *J. T. Lewis,* a few days after the execution of the deeds and assignments by J. M. Lewis, by the use of three of the mortgages which had been so assigned to him. And when J. M. Lewis demanded of J. T. Lewis a reconveyance of the property Mr.

Godwin appears admittedly as attorney for J. T. Lewis, and, thus was then acting adversely to the interests of J. M. Lewis.

But to my mind the most striking thing about the testimony of Mr. Godwin is that there is little or nothing said in reference to the actual execution of the deeds and assignments. There is no testimony that the papers were read to J. M. Lewis or by him, or as to what explanation, if any, was made as to the effect of the purported life estate reservation; and the other subscribing witness, to wit, Miss Caroline King, Mr. Godwin's secretary, was for some unknown reason not sworn as a witness to state the circumstances relating to the signing of the papers. It is true that Mr. Godwin testifies that he advised Mr. Lewis against the transaction, but he also says that he did not know what object Mr. Lewis had in mind. In other words, he did not ascertain the purpose of the transaction, and therefore, did not have before him the proper information upon which to give independent and acceptable advice.

It appears from the testimony of Mr. Lewis that when he had ascertained the true situation, the threatened litigation having turned out to be imaginary, he demanded a reconveyance of his property, and the reply made by Tom Lewis was that they would go to Conway, presumably to see Mr. Godwin; but while Tom Lewis drove him to Conway he deliberately failed to attend the conference at which an offer by way of settlement was made by Mr. Godwin. But the amount of the property proposed to be reconveyed was entirely unsatisfactory and no settlement was made.

Mr. Lewis was criticized because of an incident that occurred relating to the milking of a cow after Tom Lewis and his wife had moved over to his home and were living with him. The incident resulted in Morgan's causing Tom and his wife to leave his home, although it seems to have been rather trivial in character. It shows, however, an old man in his dotage and much lack of patience and tolerance on

the part of the young couple. And indeed the conduct of Tom Lewis toward Morgan Lewis thereafter is quite impossible to approve. Without going into detail one cannot fail to be impressed with what Mr. Lewis said in his testimony relating to the use of the automobile which he had transferred to Tom, to wit: That when Tom drove the automobile by his house he *"blows until he gets past"* (which was not denied by Tom), indicating an attitude of studied disrespect for the man whom he now claims was his voluntary benefactor to the extent of giving him practically all of his large fortune accumulated in a long lifetime of industry and self-denial.

Counsel for the respective parties cite and discuss numerous text authorities and cases, and I have endeavored to examine every one of them so cited, but it would unduly prolong this already lengthy decree to attempt to discuss many of them. Indeed, there is little or no conflict with regard to the controlling principles of law. There is, however, much variation in the facts and circumstances of the individual cases, and the principal difficulty arises in the application of the legal principles to the variant evidence. Hence, I shall only refer to a few of the authorities.

The general principles are well stated in 16 Am. Jur., 461-462, as follows:

"While any impairment of the grantor's faculties at the time of the execution of the deed is a circumstance tending to the conclusion that he was subjected to undue influence, the deed may be set aside on the ground that he was improperly influenced to execute it notwithstanding no feebleness of mind appears. If the will power has been weakened, as by severe sickness, the natural resistance to influence is, of course, impaired. Generally, in order to justify the setting aside of a deed on the ground of undue influence, it must be shown that the grantor was unquestionably susceptible to undue influence as a result of old age, mental weakness, or some other cause, and there must be some clear evidence of

opportunity and disposition on the part of the grantee or someone in his behalf to exercise such influence."

I also quote the following from Corpus Juris Secundum:

"Undue influence invalidates a deed procured thereby and generally speaking consists in a wrongful influence so exerted over the grantor as to rob him of free agency and to substitute the will of another for that of the grantor. Influence which is not undue, such as that arising from affection or from fair argument, does not destroy the validity of a deed." 26 C. J. S., 290.

"While age or physical and mental infirmity does not of itself show that the deed of a grantor suffering therefrom was the product of undue influence, such matters arouse the suspicions of equity and where found in conjunction with other factors indicating imposition may show undue influence." 26 C. J. S., 294.

"A confidential relationship exists between grantor and grantee wherever there is trust reposed by the former and dominant influence obtained by the latter, irrespective of the formal fiduciary character of their relationship. The existence of a confidential relation between the parties demands close scrutiny of a deed executed by the subservient grantor and may render it invalid for presumed undue influence when otherwise it would be sustained, although deeds between those in a confidential relationship will be upheld if fair and expressive of the free will of the grantor." 26 C. J. S., 296.

The old case of *Parris v. Cobb,* 5 Rich. Eq., 450, refers to a statement by Lord Eldon to the effect that while the court disclaimed any jurisdiction to annul donations merely as being improvident, the circumstances might be such that the court would regard such transaction with a jealous eye. And I quote the following from the decision of Chancellor Dunkin:

"If the donor is a weak man, and liable to be imposed upon, the court 'will very strictly examine the conduct of

the person in whose favor the gift is made, and, if it sees any arts or stratagems, or any undue means have been used; if it sees the least speck of imposition at the bottom, or that the donor is in such a situation, with respect to the donee, as may naturally give an undue influence over him; if there be the least scintilla of fraud, this court will and ought to interpose; and, by the exercise of such a jurisdiction, they are so far from infringing the right of alienation, which is the inseparable incident of property, that they act upon the principle of securing the full, ample, and uninfluenced enjoyment of it'."

This case involved a deed of slaves and other personalty by an aged grandfather to his grandson, and the Court discusses at some length the improvident or unconscionable nature of the transaction, stating that the same was complicated, and if the grantor understood anything about it, "it affords the more striking evidence of his general incapacity, or of the absolute control exercised by the defendant." And the Court further said that the transaction "would in itself be such an act of improvidence, as would strongly imply mental imbecility, or undue influence, or both."

■ While it is indeed true as argued by counsel for the defendant in the case at bar that mere improvidence would not be sufficient to invalidate a donation, yet the transaction may be so improvident and unreasonable as in itself to justify the inference of mental incapacity or undue influence or both.

The case of *Gaston v. Bennett,* 30 S. C., 467, is somewhat similar to the case at bar in certain respects, but involves a comparatively small amount of property. In that case the grantor made a deed of all his land to his uncle, for an inadequate consideration, who, taking advantage of his nephew's condition, obtained the deed by imposing upon him by exciting his fears in reference to a pretensive claim asserted for this purpose. The Court held that the deed should be set aside on the ground of undue influence. It should be observed that the evidence shows that the grantor was possessed of sufficient mental capacity to make a con-

tract, yet his intellect was of so weak a character as to render him liable to imposition. Yet attention is called to the fact that he was a "close buyer—shrewd in his bargains, and not easily cheated."

I quote the following from the well considered opinion delivered by Mr. Justice McIver:

"Both the referee and the circuit judge seem to have proceeded upon the theory that in order to maintain this action it was necessary to show that the plaintiff was incompetent mentally to make this deed. But, as we have said above, this is not essential, and we do not rest our decision upon that ground. On the contrary, we do not think that the testimony was sufficient to show that the plaintiff was not possessed of sufficient mental capacity to make a contract, but we think it does show that the plaintiff was a person of such weak intellect as to render him liable to imposition, and that the defendant, taking advantage of his condition, did impose upon him by exciting his fears in reference to a pretensive claim, known to be groundless, set up by defendant for the purpose of inducing him to do that which he otherwise would not have done. Upon this ground we think the deed should be set aside, allowing the defendant just compensation for such permanent improvements as he may have put upon the land, after deducting therefrom the value of the rents, less any amount paid to or advanced for plaintiff by the defendant."

Counsel for the defendant in the case now before the court argue at some length that if the deeds and transfers in question were made for the purpose of escaping the claims of creditors or to hinder, delay or defraud them in the collection of their just demands, the court would not lend its aid in setting aside the transaction; and this is a sound principle, as will appear by reference to the case of *All v. Prillaman,* 200 S. C., 279, 20 S. E. (2d), 741, but obviously this principle does not apply to pretensive claims known to be groundless. See *Gaston v. Bennett, supra.* There is no evidence that Mr. Lewis had any desire whatsoever to es-

cape the payment of his just obligations—something evidently foreign to his nature. But the evidence shows that he was alarmed by reports received by him from or on behalf of the defendant relating to a falsely alleged claim by Mrs. Cribb and Mr. Page arising from the break with Mr. Page and the departure of Mrs. Cribb from his home. In other words, the claim was a pretensive one known to be groundless and set up by defendant for the purpose of inducing Mr. Lewis to do that which he otherwise would not have done.

In the case of *Wille v. Wille,* 57 S. C., 413, a deed executed by the grantor to her son was set aside upon the ground of undue influence and inadequate consideration. And it will be observed in this case that the deed was prepared by a highly reputable attorney who properly endeavored to explain the meaning of it to the grantor, but the Court held that even this was insufficient to validate the deed, especially in view of the fact that the attorney represented the grantee.

I quote the following from the opinion in the case, delivered by Mr. Justice Jones, especially because of its reference to the law relating to mental impairment in its relation to undue influence:

"The Court, in the cases of *Banker v. Hendricks,* 24 S. C., 1, and *Gaston v. Bennett,* 30 S. C., 473, approved the principle as stated in 1 Story Eq. Jur., sec. 238, that 'the acts and contracts of persons who are of weak understandings and who are thereby liable to imposition, will be held void in Courts of Equity—if the nature of the act or contract justify the conclusion that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented or overcome by cunning artifice or undue influence.' The case of *Pressley v. Kemp,* 16 S. C., 334, cited by respondent is very different from this case. In that case the deed was prepared by an attorney under the direction of the grantor who executed it, after reading it over, with full knowledge and comprehension of what she was doing."

In the case of *Zeigler v. Shuler,* 87 S. C., 1, a deed executed by one of weak mentality, suffering from a permanent

injury, conveying to his brother at his instance a valuable tract of land for largely voluntary consideration, was set aside. See also *Devlin v. Devlin,* 89 S. C., 268.

There are many other cases where deeds have been set aside, and the cases are likewise numerous where the Court has refused to set them aside, for it depends upon the facts and circumstances of the particular case. I am of opinion that the established principles of equity require a judgment in favor of the plaintiffs.

It follows from what has been said that the two real estate deeds aforesaid executed by J. M. Lewis to J. T. Lewis should be adjudged null and void and that they should be cancelled and rescinded.

And it likewise follows that the assignment of certain mortgages to J. T. Lewis by J. M. Lewis was wholly invalid. But it appears that three of these mortgages were turned over by J. T. Lewis to W. O. Godwin in payment of his fee hereinbefore referred to, and the other two mortgages were later collected and satisfied by J. T. Lewis. The evidence also shows that after the execution of the deeds in question in this case two certain loans of the funds of J. M. Lewis were made and as security therefor real estate mortgages were taken by J. T. Lewis, but that one of them was thereafter paid and satisfied. The other one of these mortgages should be held to be the property of the estate of J. M. Lewis, deceased, and should be assigned by J. T. Lewis to his administrator. And if there are any other such mortgage or mortgages, the same ruling is applicable thereto.

The amended complaint alleges that the defendant J. T. Lewis collected rents belonging to J. M. Lewis in the sum of $142.35, for which he should be required to account, and there were introduced in evidence receipts signed by J. T. Lewis purporting to be for rents in this amount. The defendant admitted that these receipts were genuine except he said that one of them was for lumber and repairs furnished by a tenant, and did not represent money received by him.

■ As was hereinbefore stated, the answer of the defendant J. T. Lewis alleges that certain payments were made by him for the benefit of J. M. Lewis, and included therein were certain payments of taxes, and his testimony is to the same effect. It is, however, quite unsatisfactory because he does not attempt to give the amounts of these payments except in a few instances, and he makes no complete statement of receipts or disbursements, though it seems to me that it would have been a very simple matter for him to do so; and it will be observed that counsel for the plaintiffs requested him to bring in his cancelled checks and receipts, but he failed to do so. However, in view of the rulings of the Court as expressed in this decree, the defendant J. T. Lewis should be required to account for all moneys received by him arising from the property conveyed to him by J. M. Lewis as aforesaid, including the transfer of his bank balance, taking credit for all proper disbursements of the same; and whatever balance remains due should of course be paid by him to William Morgan Lewis, as administrator of the estate of J. M. Lewis, deceased.

Francis Lewis, a brother of the defendant J. T. Lewis, was made a party defendant to this cause upon the allegations contained in the amended complaint to the effect that on or about November 12, 1940, J. T. Lewis executed to Francis Lewis a mortgage in the principal sum of $654.50 covering Tract No. 8 in the deed for the Horry County lands executed by J. M. Lewis to J. T. Lewis, dated August 8, 1940. And it is further alleged that this mortgage was without consideration and was executed and accepted for fraudulent purposes.

The defendant Francis Lewis in his separate answer to the amended complaint alleges, among other things, that the mortgage held by him secures a valid indebtedness and is justly and truly payable to him, and he denies all the allegations of fraud. The allegations of his answer further show that the money lent to J. T. Lewis was his share of the proceeds of the timber sale made in October, 1940. In this con-

nection it should be mentioned that the testimony of J. T. Lewis indicates that he subsequently paid to Francis Lewis $400.00 on account of his share of the timber money, which presumably was a credit on the mortgage.

There was, however, no evidence offered by the plaintiffs relating to the allegations contained in the amended complaint as to Francis Lewis; and hence it follows that he should be dismissed from the action on account of such failure of proof. In other words, the plaintiffs did not make out, or attempt to make out, their alleged case against Francis Lewis. However, if any balance remains unpaid on this mortgage it will be the duty of J. T. Lewis to liquidate the same and to cause the mortgage to be satisfied of record.

It is, therefore, ordered, adjudged and decreed, that the deeds executed by J. M. Lewis to J. T. Lewis hereinbefore referred to, to-wit, the deed dated August 8, 1940, and recorded in the Clerk's Office for Horry County, S. C., August 9, 1940, in Book Q-7, at page 123, and the deed dated August 8, 1940, and recorded in the Clerk's Office for Marion County, S. C., August 9, 1940, in Book A-37, at page 350, be, and the same are hereby, declared to be null and void; and the clerk of this court is hereby directed to enter upon each of these deeds the cancellation thereof, making appropriate reference to this decree, and such notation of cancellation shall also be entered on the margin of the deed books where these deeds are recorded.

And it is further ordered, adjudged and decreed, that the defendant J. T. Lewis do, within twenty (20) days after written notice of the filing of this decree, assign, in due and proper form, to William Morgan Lewis, as Administrator of the Estate of J. M. Lewis, deceased, any mortgage or mortgages in his name belonging to the estate of J. M. Lewis, deceased, together with the evidences of indebtedness thereby secured.

And it is further ordered, adjudged and decreed, that it be referred to J. K. Dorman, Esq., Master, to take and state

the account of the defendant J. T. Lewis (and he is hereby required so to account) for all his receipts and disbursements of moneys belonging to the estate of J. M. Lewis, deceased, and to ascertain the balance, if any, due by him to the said estate, taking all necessary testimony in the premises and determining all questions both of law and of fact which may then arise, and to report his conclusions and recommendations to this court, with leave to report any special matter.

And it is further ordered, adjudged and decreed, that this action be, and the same is hereby, dismissed insofar as the defendant Francis Lewis is concerned, for the reasons hereinbefore stated: *provided, however,* that if any balance remains due upon the mortgage executed by J. T. Lewis to Francis Lewis the same shall be liquidated by the defendant J. T. Lewis and the mortgage satisfied of record within twenty (20) days after written notice of the filing of this decree.

The plaintiffs, or any of them, shall have leave to apply to the court upon proper notice for such other and further order or orders as may be necessary or advisable for the effectuation of this decree.

As hereinbefore stated, the issues raised by the answer of the intervenor, Joe Charles Lewis (otherwise known as Joe Morgan Lewis), as to who are the heirs-at-law of James Morgan Lewis, deceased, are not now before the court for determination; and the cause remains open for the future trial of such issues and any and all questions incident thereto, as well as for the accounting aforesaid.