231 S.C. 119 (1957)
97 S.E.2d 396
LONNIE AVANT, Individually, and as Executor of the Will of Emerett Johnson, Plaintiff-Appellant,
v.
KING JOHNSON, JOSEPH JOHNSON, ELIJAH JOHNSON, PLUMMER JOHNSON, CLARA JOHNSON, WINNIE JOHNSON, TALETHA J. MOODY, MAGGIE J. WILSON, ILLA J. BRANTLEY, and ACIE JOHNSON, Defendants-Respondents.
17277
Supreme Court of South Carolina.
April 1, 1957.
*120 *121 Messrs. James B. Dixon and Norton & Norton, of Marion, for Appellant.
Messrs. S. Raymond Pridgen, of Mullins, and Woods & Woods, of Marion, for Respondents.
*122 Messrs. James B. Dixon and Norton & Norton, of Marion, for Appellant, in Reply.
The opinion of Judge Baker follows:
This is an action by Lonnie Avant, individually, and as executor of the will of Emerett Johnson, to set aside a deed bearing date January 9, 1952, but actually executed on January 10, 1952, on which date it was filed in the office of the Clerk of Court for Marion County and recorded in Deed Book A-56, at page 164, whereby the said Emerett Johnson, the widow of Ellison Johnson, a prosperous Negro minister and farmer, conveyed to the ten children of *123 Ellison Johnson by a former wife, at a consideration of $4,000.00, all her interest amounting to one-third in three tracts of land situated in Marion County; the first tract containing 311.8 acres, more or less, known as the "Wahee Place"; the second containing 43.75 acres, more or less, and the third containing 7 acres, more or less, the latter two being known as the "Penderboro Place," appraised in Probate proceeding at $12,000.00; also her interest in the personal property of Ellison Johnson which was appraised at $1,465.00, to which sum should be added a mortgage not listed but upon which there was collected the sum of $1,070.00.
The defendants are all the children of Ellison Johnson by a former marriage. The plaintiff, Lonnie Avant, is one of the children of Emerett Johnson by a former marriage and is the executor under the Will of Emerett Johnson made some time prior to the execution of the deed sought to be set aside.
The alleged grounds for setting aside the deed are lack of mental capacity, fraud, undue influence and inadequacy of consideration, which is "a frontal assault upon the validity of the deed," Brock v. Brock, 218 S.C. 174, 61 S.E. (2d) 885, 888. The deed under attack is regular and valid on its face, which gives rise to the presumption that it is valid in all respects. Grant v. Hudson, 192 S.C. 394, 7 S.E. (2d) 2.
The evidence certainly supports the reasonable inference or conclusion that there is inadequacy of consideration if viewed strictly as a business or commercial transaction, but this, alone, does not suffice to set the transaction aside. It is only important in connection with the alleged factors of mental weakness, or lack of mental capacity, fraud and undue influence, Owens v. Sweat, 227 S.C. 112, 86 S.E. (2d) 886.
It is true, as argued by plaintiff, a "transaction may be so improvident and unreasonable as in itself to justify the inference of mental incapacity or undue *124 influence or both," Page v. Lewis, 209 S.C. 212, 39 S.E. (2d) 787, 799. It is also equally true that "an important element of the ownership of property is the right of the owner to convey it on any terms within its (his) intention," Brock v. Brock, 218 S.C. 174, 61 S.E. (2d) 885.
Emerett Johnson, the deceased-grantor, at the time of her marriage to Ellison Johnson, was a widow with children, there being eight, all adults, living at the time of her death in April of 1952. Ellison Johnson was a widower with ten children, which children are the grantees in the deed under attack, and the defendants in this action. Ellison Johnson died intestate on or about December 5, 1951, leaving as his heirs-at-law his widow, Emerett Johnson, and his children, the defendants.
Emerett Johnson suffered a stroke in 1949, and her condition grew progressively worse until her death in April, 1952. She was first treated by Dr. S.O. Cantey in September, 1951, who described her condition as paralysis of the left side, hardening of the arteries, and exhibited many references of cerebral arteriosclerosis. Dr. Cantey estimated "from the beginning she very likely suffered a dozen or so small strokes." From the date of the first stroke Emerett Johnson was practically an invalid and for several months prior to her death was a complete invalid, which latter period extended beyond September, 1951.
The mental condition of Emerett Johnson, not her physical condition, except in so far as her mentality was affected thereby is one of the cardinal features.
Ellison Johnson died sometime during the night of December 5th. In the morning of December 6th, the plaintiff, Lonnie Avant, moved his mother to his home where she remained until her death. On December 20, 1951, Emerett Johnson executed her last will and testament, leaving all of her property, real and personal, to Lonnie Avant, who was also appointed executor, to serve without bond. It is significant that on the dates of the execution of the will and deed *125 the deceased was living with the sole devisee under her will, and not under the same roof with any of her stepchildren, the defendants.
The transaction with the deceased grantor, whether valid or invalid, was handled by Joseph Johnson, acting for himself and his brothers and sisters. There is no evidence that Joseph Johnson, or any of his brothers and sisters, were acquainted with farm values, or knew the value of their father's estate. In any event, to arrive at an offer to submit to Emerett for her interest Joseph Johnson went to the Judge of Probate for advice and was instructed to have the property appraised and to offer one-third the appraisal value. The appraisers appointed by the Court of Probate agreed upon a valuation of $12,000.00 for the real property and $1,465.00 for the personal property. Inadvertently omitted was a mortgage upon which there was later realized approximately $1,000.00. It was brought out in the hearing this appraised valuation was for tax purposes, but there is no evidence that Joseph was cognizant of this fact. Joseph then went to Lonnie's home and talked with Emerett who, according to his testimony, to which there was no objection, agreed to accept $4,000.00 for her interest. The money was borrowed through Mr. Franklin Cooper who employed S. R. Pridgen, Esq., of the Mullins Bar, to check the title, prepare the note, mortgage and deed, and attend to their proper execution. At this point it should be stated Mr. Pridgen was representing the lender and no one else. His only interest was the protection of his client and the record does not contain the slightest creditable inference or suggestion of improper conduct on his part.
On January 10, 1952, Mr. Pridgen, Mr. Cooper, Joseph and a sister, went to Lonnie's home to complete the transaction. No effort was made towards consummation until Lonnie could be located and be present, which required a lengthy wait. After Lonnie arrived, Mr. Pridgen first talked with Lonnie, at the request of Joseph, and, as related by Mr. Pridgen, Lonnie did not want his mother to sign the deed *126 and made the statement  he did not think she was in her right mind. Mr. Pridgen thereupon sat down on the bed by the grantor, and, quoting from Mr. Pridgen's testimony, "I took the deed in my hand that I had prepared, and as simply as I could I explained to Emerett Johnson the contents of the deed. It was  I did not at any time tell her about the worth of the place, as that was no concern of mine. I was solely interested in representing my client, Mr. Cooper, in ascertaining if she was capable of executing a deed, because his mortgage would be based upon the deed.
"After I had explained it to her as simply as I could, telling her in detail what it contained, all of the real property and all of the personal property as owned by her deceased husband of which she had an interest. I then asked her if she desired to complete the transaction  I am not using the words I used  I could not say the words I used as I do not remember, but I also asked her if she knew the paper  what it was, and I wouldn't swear she said she knew it was a deed, or a paper, but there was no question in my mind as an attorney that she knew what the paper was and what she was doing. She made this statement, or to a similar effect: I want to sign the deed  I think Ellison's children should have the property  that was essentially what she said. As far as I was concerned, I was ready to complete the transaction. I turned to Mr. Cooper who was right in the small room. He was there and I was representing him, and I said there is no question in my mind as to the capacity of Emerett Johnson to execute the deed * * *.
"Joseph told me he did not want to go ahead unless Lonnie was satisfied as to the transaction, and I explained again to Joseph, the best I remember, that it was not necessary for Lonnie to sign the deed or sign any other paper; but he didn't want to complete the transaction unless Lonnie was satisfied, and Lonnie was talking quite loud to Joseph, saying his mother didn't know what she wanted to do, and generally talked between Joseph and the two sisters. And finally, Lonnie said he would not do anything unless Mr. Dixon *127 would concur in the transaction, and I told Lonnie if he desired that I go back to Marion with him and take the deed, and go over the deed with Mr. Dixon, simply for the purpose of checking the deed and the consideration and what the deed contained, I would do that; but if he wanted to go back to Marion to go into the consideration  that when Mr. Cooper and myself went there, we thought that had been settled and we had been there a good while, and I didn't have time myself, and Mr. Cooper was wanting to get away. So finally, Mr. Cooper and myself said we had to leave and we stepped out of the door to go, and got in the car, and some one told Joseph and those to come on, but they lingered behind talking, and shortly afterwards, they called us back.
"I think Joseph opened the door and told us to come on in that Lonnie was satisfied. Just prior to that time, Robert Lee, the best I remember had come into the room through the back door, and I talked with Robert Lee about the transaction, and Robert Lee said certainly his mother knew what she was doing, and got on Lonnie, and asked him why he was causing all the disturbance, and he said you know mother wants to go ahead and let Ellison's children have the property  the deed is made and they are here prepared to carry it through, and asked Lonnie why he was carrying on so. And after we stepped back into the house, I went back to the bed and took the deed, and in my own handwriting, wrote Emerett Johnson's name and made her mark, and let Emerett Johnson touch the pen.
"I witnessed the deed along with Mr. Cooper. Because of the fact that Joseph was so interested in getting something from Lonnie, a receipt, I prepared on the back of a check  the only thing I could find  I think we got it out of the pocket of Mr. Cooper's car  a receipt for the money. I told Joseph that wasn't necessary, but he wanted Lonnie to sign it."
Lonnie signed the receipt, then decided against the transaction. Mr. Pridgen placed the money on the bed, and Lonnie *128 was told by Emerett "to take that money and put it in the bank."
Mr. Pridgen's account of what occurred in the home of the plaintiff is contradicted by the plaintiff, with some variances by Robert Lee Avant, but the entire record justifies the acceptance of the evidence of Mr. Pridgen as true and correct.
Since Emerett was confined, through her malady, to the home of Lonnie Avant, and therefore beyond the direct influence of Joseph Johnson it is argued or contended that the interposition of Joseph was through Melvin Godbold who, though innocent, was a strong contributing factor in persuading the deceased to part with her interest in the estate without knowing its value. Melvin, a brother-in-law to the deceased, went to see the grantor after talking with Joseph and a first cousin of Emerett's. He stated he did not know what interest Emerett had in the estate, was not concerned with its value, but his only purpose was to remove any "confusion" between the defendants, Lonnie and his mother. This witness testified that on the date he talked with her, she was in her "right mind" and agreed to do whatever Lonnie said was acceptable. He then conferred with Lonnie, who consented to the figure of $4,000.00, this, however, being denied by the plaintiff.
The evidence does not support any contention that Melvin Godbold perpetrated or attempted to perpetrate any fraud upon the grantor, or exercised undue influence.
The testimony of Lonnie Avant is contradictory of that offered by the defendants, but its probative value is materially reduced by certain facts and evidence of other witnesses. If his mother was under the influence of anyone, the natural presumption is Lonnie would exercise the greatest persuasion since she had been living with him since December 6, 1951, and on December 20th, she signed her will designating the plaintiff as her sole devisee and legatee. Although the plaintiff says his mother was not mentally competent *129 when the deed was signed, it is apparent that his real reason for attacking the transaction is reflected by the following question and answer quoted from his testimony:
"Q. What was your reason for not closing the transaction or taking the money at that time? A. Because I was offered $4,000.00 more."
This is not the only instance in the plaintiff's testimony where he conceded that his interest or concern was based upon what he was going to get rather than his mother which leaves the reasonable inference that if $8,000.00 had been paid this case would not be in court, notwithstanding competency or incompetency. Adverse to plaintiff is his signing of the receipt and retention of the consideration without a tender thereof to defendants or depositing the money with the Clerk of Court.
Robert Lee Avant, older brother of Lonnie, was present when the deed was signed. Although he stated his mother "was unable to be disturbed," "weren't able to do anything," this witness further testified that Mr. Pridgen explained the deed in detail to his mother and asked her if she desired to sign it of her own free will, after which his mother touched the pen, the money was counted out on her bed, Lonnie signed a receipt therefor, and Emerett told Lonnie to take the money and put it in the bank.
Generally, the testimony of Dr. Cantey portrays weakness and confusion of intellect, but there are several illuminating excerpts in his evidence:
"What effect does this arteriosclerosis of the brain have on a person? A. It has many effects, and in her particular case, one effect was that of paralysis, and she also at times was quite lucid in her thinking, and at other times, she was very confused."
Dr. Cantey examined Emerett on January 11, 1952, for the purpose of ascertaining whether or not the appointment of a committee to handle her affairs was necessary. The following *130 is taken from direct and cross examination of Dr. Cantey as to the results of this examination:
"Q. Would you say that at that time she was able to, or had sufficient mentality to realize the seriousness of her action in selling her interest in two farms of values amounting to $20,000.00, or more? A. I do not think she was mentally competent to make a decision of any kind.
"Q. You had been seeing her during the year from time to time prior to that. What would you say her mental condition was up to that? A. It varied, as it does with all cases. They have lucid moments when the memory is good, and they recognize every one and know what they want, and at other times, I do not believe she recognized her own children and certainly not other people. Some times I could talk to her and knew what she was trying to tell me, and at other times, I could not understand her. I would say that her condition was slowly progressive.

* * *
"Q. * * *. Now, doctor, you don't know what her condition was the preceding day, of course, or two days preceding  of your own knowledge? A. I didn't see her.
"Q. You didn't see her, so you could not be prepared to say what her condition was on the 9th or 10th? A. No.
"Q. And you are only testifying as to what you found on the 11th? A. Yes.
"Q. You don't think she had mental capacity to know she was making a deed? A. I think she would know she was signing a paper.
"Q. If it was explained to her, do you think she would know it was a deed? A. Yes.
"Q. And she knew she got money for signing a paper when you examined her? A. Yes.
"Q. And you said she knew she was disposing of her interest in her husband's estate? A. Yes.
"Q. And that being true, she must have known the character of the act she was performing? A. Yes, sir.
*131 "Q. Did she say what she did with the money? A. She said she thought Lonnie had the money."
Dr. J.J. Graham examined or attended the deceased during the latter part of 1950 or early in 1951, and conducted another examination on January 10, 1952, the same date the deed was signed, but after its execution. His testimony descriptive of the physical condition is the same as Dr. Cantey's, but somewhat stronger on the issue of mental competency. Dr. Graham's evidence upon the mental issue may be condensed into his answer to the many questions propounded him:
"I think I said I saw her in 1950 or early 1951, and then saw her in 1952, and I believe from 1950 on to 1952  anywhere between that period, I do not believe she was competent to handle business."
The evidence of Dr. Cantey has more probative value than that of Dr. Graham for the obvious reason that Dr. Cantey possessed greater familiarity with Emerett's condition than Dr. Graham. Following Dr. Cantey's testimony it is quite possible and probable that the grantor could have been "quite lucid" on the date she signed the deed, but the evidence of Dr. Graham places the plaintiff in the tenuous position of becoming the sole beneficiary in the will of Emerett Johnson, executed when her mental condition was bad.
If it is admitted that the testimony of the medical witnesses would show mental incapacity, there is to the contrary, creditable evidence, direct and circumstantial, particularly that of Mr. Pridgen, who thoroughly understands the meaning and effect of a deed of conveyance, and is in a position to know whether his explanation of the transaction was understood, and its effect realized, by the grantor. The principle of law, or evidence, is well stated in Windham v. City of Florence, 221 S.C. 350, 70 S.E. (2d) 553, 556:
"While there may be circumstances where medical testimony is conclusive, ordinarily such opinions, although uncontradicted, *132 are not conclusive in the sense that they must be accepted as true. They may be rejected if found inconsistent with the facts or otherwise unreasonable. [Citing cases] The subject of expert medical evidence was discussed by the present Chief Justice in the case of In Re Crawford, supra, where he observed: `Instances are not wanting in which this and other courts have been called upon to completely reject expert testimony.' (205 S. 72, 30 S.E. (2d) [841] 848)"
My study of the record leads to the one reasonable conclusion that while it is possible the grantor's mental powers were impaired, she, however, at the very time of the execution of deed, had sufficient capacity to understand in a reasonable manner the nature and effect of the act which she was performing, DuBose v. Kell, 90 S.C. 196, 71 S.E. 371.
The evidence does not substantiate fraud, misrepretation or undue influence. The plaintiff has not met the burden of proof required, nor from the whole record is there sufficient evidence to sustain his case. Emerett Johnson knew she possessed a widow's interest, and there is competent, preponderant testimony she knew this interest was one-third of the estate. This case does not come within the affirmative of the principle quoted from Pomeroy, Eq. Jur., in Owens v. Sweat, supra [227 S.C. 112, 86 S.E. (2d) 887].
"`When the accompanying incidents are inequitable and show bad faith, such as concealment, misrepresentations, undue advantage, oppression on the part of the one who obtains the benefit, or ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities, and the like, on the part of the other  these circumstances, combined with inadequacy of price, may easily induce a court to grant relief, defensive or affirmative.'"
The real intent of the grantor is undoubtedly revealed in the testimony of Melvin Godbold and Mr. Pridgen. Quoting *133 again from Mr. Pridgen's testimony: `She made this statement, or to a similar effect: I want to sign the deed  I think Ellison's children should have the property  that was essentially what she said."
It is likely that the grantor did not have full realization of the market value of her interest, but she was not selling on the basis of market value. Knowing she would not live much longer, she had decided the defendants, the children of her deceased husband, should have the property her husband had accumulated, and on this basis an agreement as to the consideration was reached, rather than on a business or commercial proposition. The inadequacy of consideration as compared to the market value is not then a matter of serious importance.
The special referee is entitled to compensation for his time in hearing and reporting the testimony. I do not know the exact number of days consumed and for this reason an order will hereafter be issued setting his fee.
Plaintiff's complaint is dismissed with costs charged against defendants. Ordinarily costs would be charged against plaintiff, but in this case the accepted offer to the grantor did not include one-third of the appraised value of the personal property, to wit, $1,465.00, this omitted probably through ignorance, and one-third of a mortgage, inadvertently omitted from the appraisal but later collected. It is only fair and equitable that defendants pay the costs.
April 1, 1957.
MOSS, Justice.
The decree of Honorable G. Badger Baker has been carefully considered in the light of the record and the exceptions. The issues presented by the exceptions were correctly decided by the lower Court. The exceptions are overruled and the decree of the lower Court is adopted as the judgment of this Court.
TAYLOR, OXNER and LEGGE, JJ., and G. DUNCAN BELLINGER, Acting Associate Justice, concur.