351 S.C. 287 (2002)
569 S.E.2d 371
Dr. J. Gray MACAULAY, James C. Perrin, Gladys L. Perrin, Neill M. Perrin, Mary P. Coxe, Joanne M. Cauthen, Dr. Neill W. Macaulay, Rebecca M. Clark, Theodica M. Greene, Henrietta M. Marett, Kathryn D. Durham, William B. DePass, Jr., Wilkes D. Macaulay, Kathryn M. Bishop, Isabel M. Schell, and Dr. Hugh H. Macaulay, Jr., Respondents,
v.
WACHOVIA BANK OF SOUTH CAROLINA, N.A., Estate of Sara M. McLeod, James L. MacLeod, Individually and as Personal Representative of the Estate of Sara M. McLeod, William L. McLeod, Jr., and Kathryn M. DePass, Defendants,
Of whom James L. MacLeod, Individually and as Personal Representative of the Estate of Sara M. McLeod, and William L. McLeod are, Appellants.
No. 3524.
Court of Appeals of South Carolina.
Heard November 7, 2001.
Decided June 27, 2002.
Rehearing Denied September 18, 2002.
*291 T.S. Stern, Jr. and Karen Creech, both of Covington, Patrick, Hagins, Stern & Lewis, of Greenville, for appellants.
Ben G. Leaphart, of Ashmore, Leaphart & Rabon, of Greenville, for respondents.
HOWARD, J.:
This is an action to set aside an irrevocable life insurance trust based upon allegations of incompetence of the settlor and undue influence by the beneficiaries. Isabel M. Dusenberry executed a revocable trust ("the First Trust") and an irrevocable trust ("the Second Trust"). The Second Trust was funded by a newly acquired life insurance policy which had a single premium almost as great as the face amount of the policy due to her age and health. Several beneficiaries of the First Trust (collectively "Respondents") brought this action against Wachovia Bank, as Trustee, and the other named defendants, as beneficiaries of the Second Trust, to set aside the Second Trust and insurance policy. After a full hearing, the probate court concluded Dusenberry was incompetent and subject to undue influence when she executed the Second Trust and purchased the insurance policy. The court ordered the beneficiaries of the Second Trust to return the proceeds of the Second Trust for distribution to Dusenberry's heirs. Beneficiaries of the Second Trust (collectively, "Appellants") appeal.

FACTS
Dusenberry, one of ten children, was born in July 1899. She was an astute businesswoman, and though she could be generous with others, she was known to be frugal with her own expenses. Dusenberry had no children.
In October 1981, Dusenberry and her husband executed wills and revocable trusts leaving the bulk of their estates to each other in the event of death. Soon thereafter, Dusenberry's husband passed away and she began receiving income from her husband's marital trust, for which she held a power of appointment.
In 1987, Dusenberry became unhappy with the bank then administering her trust and moved it and its assets to South Carolina National Bank ("SCN"), which later merged into *292 Wachovia. SCN did not want to hold a power of attorney for Dusenberry as the prior bank had; therefore, Dusenberry executed a durable power of attorney in December 1987 in favor of her sister Sara McLeod and her nephew James MacLeod.[1]
On April 5, 1988, Dusenberry executed a will and the First Trust, a revocable trust agreement with SCN as the named trustee. At this time, Sara McLeod and Kathryn DePass were Dusenberry's only living siblings. However, Dusenberry had over twenty nieces and nephews. The First Trust had assets of nearly two million dollars, with an estimated annual income of $131,000. Under the First Trust, 75% of the trust assets (Share A) was divided among numerous relatives and a few former employees. The remaining 25% (Share B) was apportioned among a dozen charities. Among the beneficiaries of Share A, Sara McLeod was to receive 15%, Kathryn DePass 5%, James MacLeod 4%, and William McLeod 3%.
In the will, Dusenberry exercised her power of appointment over the marital trust, giving 25% to Kathryn DePass and 75% to Sara McLeod or her heirs. On August 2, 1988, Dusenberry executed a codicil to her will which altered the power of appointment over the marital trust. The codicil gave 75% of the income of the marital trust to Sara McLeod. Upon Sara's death or upon Dusenberry's if Sara predeceased her, the income was to go to James MacLeod. Upon the death of the survivor of Sara and James, the trust was to be paid out 50% each to the heirs of James MacLeod and his brother William McLeod.
By August 1988, Sara McLeod, the sister Dusenberry had favored under her existing estate plan, was very ill with cancer. On August 18, 1988, Dusenberry filled out an application for a single premium whole life insurance policy with a face value of $250,000. Grady Jenkins, the insurance agent who assisted Dusenberry in obtaining the policy, testified that he had discussed purchasing the insurance with Dusenberry several times before the application was signed. According to Jenkins, Dusenberry was concerned that her estate would be tied up for some time and was interested in insurance because *293 the proceeds would be distributed to the beneficiaries quickly, which would ensure that Sara McLeod's needs were funded. By the time the insurance company received all of Dusenberry's health information, several months had elapsed since the original application had been signed. Dusenberry therefore signed a second application at the request of the company on March 30, 1989. Because of Dusenberry's health and age, the premium for the life insurance policy was $238,750.
On April 29, 1989, Dusenberry executed the Second Trust, funded by the life insurance policy. Other than an initial ten dollar contribution, the insurance policy was the sole asset of the Second Trust. The Second Trust provided for payment of the anticipated $250,000 in proceeds as follows: (1) $150,000 to Sara McLeod, and if she did not survive Dusenberry, then to her descendants; (2) $50,000 to James MacLeod; and (3) $50,000 to Kathryn DePass.
Dusenberry had a series of strokes and was placed in a nursing home in December 1989. Appellants concede she was incompetent after that time until her death in April 1991. According to Appellants, the proceeds of the life insurance policies were paid in June 1991 as provided by the Second Trust. Because Sara McLeod died a few months before Dusenberry, James MacLeod received half of Sara's share of the proceeds, or $75,000, plus his own share of $50,000, for a total of $125,000.
Respondents brought this action seeking to set aside the Second Trust and insurance policy on the grounds that Dusenberry was incompetent when she executed the documents and that she was unduly influenced by James MacLeod and Sara McLeod. The probate court agreed, ruling Appellants must return the proceeds of the Second Trust for distribution to Dusenberry's heirs. Appellants, beneficiaries of the Second Trust, appeal.

STANDARD OF REVIEW
"If the proceeding in the probate court is in the nature of an action at law, the [appellate] court may not disturb the probate court's findings of fact unless a review of the record discloses there is no evidence to support them." Howard v. Mutz, 315 S.C. 356, 361, 434 S.E.2d 254, 257 (1993). "On the *294 other hand, if the probate proceeding is equitable in nature, the [appellate] court, on appeal, may make factual findings according to its own view of the preponderance of the evidence." Id. at 361-62, 434 S.E.2d at 257-58.
The parties agree that Respondents principally sought, and the probate court awarded, equitable relief in the form of a constructive trust on the proceeds of the life insurance policy distributed from the Second Trust. An action to declare a constructive trust is one in equity and this Court may find facts in accordance with its own view of the evidence. Lollis v. Lollis, 291 S.C. 525, 530, 354 S.E.2d 559, 561 (1987). The evidence must be clear, definite and unequivocal to establish a constructive trust. Id. A constructive trust results "when circumstances under which property was acquired make it inequitable that it be retained by the one holding legal title. These circumstances include fraud, bad faith, abuse of confidence, or violation of a fiduciary duty which gives rise to an obligation in equity to make restitution." Hendrix v. Hendrix, 299 S.C. 233, 235, 383 S.E.2d 468, 469 (Ct.App.1989).
Although this Court is not bound by the probate court's credibility determinations, deference to the probate court's findings is appropriate in circumstances where it is apparent from the record that the credibility of the witnesses was a key consideration in weighing the evidence. Weathers v. Bolt, 293 S.C. 486, 488, 361 S.E.2d 773, 774 (Ct.App.1987) ("It is axiomatic that the probate court was in the best position to judge credibility.").

DISCUSSION

I. Mental Capacity
First, Appellants contend the probate court erred in finding Dusenberry lacked the requisite mental capacity to execute the Second Trust and insurance policy. We agree.
The parties agree that the relevant standard for capacity is a contractual standard. Therefore, in order to have the mental capacity required to execute the Second Trust and life insurance contract, Dusenberry must have had the mental capacity to understand or comprehend the subject of the contract, its nature, and its probable consequences. See Cathcart *295 v. Stewart, 144 S.C. 252, 261, 142 S.E. 498, 500-02 (1928); Du Bose v. Kell, 90 S.C. 196, 207-08, 71 S.E. 371, 376 (1911).
"[A] `transaction may be so improvident and unreasonable as in itself to justify the inference of mental incapacity or undue influence or both.'" Avant v. Johnson, 231 S.C. 119, 123-24, 97 S.E.2d 396, 398 (1957) (quoting Page v. Lewis, 209 S.C. 212, 240, 39 S.E.2d 787, 799(1946)). However, "[i]t is also equally true that `an important element of the ownership of property is the right of the owner to convey it on any terms within [her] intention.'" Id. (quoting Brock v. Brock, 218 S.C. 174, 180, 61 S.E.2d 885, 888 (1950)). The party alleging incompetence bears the burden of proving incapacity at the time of the transaction by a preponderance of the evidence. Grapner v. Atl. Land Title Co., 307 S.C. 549, 551, 416 S.E.2d 617, 618 (1992).
Both Appellants and Respondents presented copious testimony regarding Dusenberry's capacity. The probate court explained that its ruling turned largely on its assessment of the credibility of the witnesses. Specifically, the probate court stated:
It was striking to the Court the obvious inconsistencies between the spoken words utilized by the witnesses and. . . other subtle non-verbal cues communicated as a part of each witnesses' [sic] testimony . . . not reflected in the transcribed record. It was clear that these highly educated individuals were more adept than average witnesses in carefully orchestrating their responses to questions in an attempt to promote their position in the litigation. . . . The Court finds these tactics and subtle nuances in the case lessened the credibility of the family witnesses on both sides of the case. The Court concludes that even the non-family witnesses who testified had bias or motive (i.e., financial gain, loyalty to the family, etc.) with the exception of Sara Drawdy. . . . The Court finds that Drawdy was the only witness whose testimony is one hundred percent consistent with the time line of events and voluminous exhibits that were presented to the Court over the course of the lengthy trial. Further her testimony is compelling and completely believable. Her testimony is consistent and uncontradicted by her actions.
*296 Generally this Court defers to the probate court's findings regarding credibility of the witnesses. See Weathers, 293 S.C. at 488, 361 S.E.2d at 774. However, Drawdy's testimony at trial was presented through video deposition, which places us in an equal position to judge Drawdy's credibility. Nevertheless, though we agree that Drawdy was a credible witness, we do not find that her testimony supports a conclusion of incompetency. To the contrary, we conclude that the Respondents have failed to prove Dusenberry was incompetent.
Drawdy described her observations of Dusenberry's behavior during the times they spoke. However, Drawdy admitted she had little knowledge of Dusenberry and little contact with her. Drawdy met with Dusenberry between eight and twelve times during her administration of the First Trust. Drawdy testified that much of what she knew about Dusenberry had been told to her by either James MacLeod or William "Rusty" DePass and that she was unsure what she actually remembered and what she had been told. Drawdy acknowledged that the events in dispute had occurred a long time ago and that they were no longer clear in her mind. She stated that she noticed a change in Dusenberry's demeanor during the time she knew Dusenberry; however, she further stated, "I don't know how much of this can be ascribed to a change in her or my just being around her more and observing her interaction with others."
Drawdy's main concerns regarding Dusenberry's competence relate to her belief that the Second Trust was not a wise estate planning measure and that it deviated from Dusenberry's previous estate plans.[2] Drawdy asserted, and the probate *297 court agreed, that no estate planning benefit was gained through the creation of the Second Trust.
It is undisputed that the funds from the Second Trust reached the intended beneficiaries within sixty days, while settlement of the First Trust took considerably longer. Jenkins, the insurance agent, testified that Dusenberry was concerned that settlement of her estate would take some time, while life insurance would be distributed to the beneficiaries quickly. Essie Arnold, Dusenberry's second cousin and a frequent visitor, echoed this testimony in her deposition. James MacLeod also testified that Dusenberry had been concerned regarding the length of time before beneficiaries would receive payment and that it indeed took several years for him to receive money from the First Trust. If Dusenberry's purpose was to supply her ill sister with funds as soon as possible after her death, such a strategy makes sense. In our view, the transaction is not so improvident or unreasonable in itself as to support an inference of incompetency. See Avant, 231 S.C. at 123-24, 97 S.E.2d at 398.
The probate court found further support for its decision in Drawdy's concern that the beneficiaries or beneficial interests of the Second Trust were different from those of the First Trust. Again, we disagree with this conclusion. Dusenberry was entitled to alter her estate plan in any way she saw fit.[3] As stated in Avant, "[A]n important element of ownership of property is the right of the owner to convey it on any terms within [her] intention." 231 S.C. at 123-24, 97 S.E.2d at 398.
Furthermore, though the forms of the trusts are different, the disposition of the property bears a strong resemblance to Dusenberry's previous estate planning. All of the beneficiaries of the Second Trust were beneficiaries under the First Trust. The shares of Dusenberry's sisters Sara McLeod and Katherine DePass under the 1981 will and trust, the First Trust, and the Second Trust are proportionally the same. James MacLeod took a larger share under the First Trust *298 than several other relatives and friends, which is consistent with the Second Trust. In Dusenberry's exercise of her power of appointment in her will and the subsequent alteration in her codicil, she further demonstrated a consistent pattern of giving a larger portion of her assets or income to Sara McLeod and her children over other relatives.
Although the probate judge discounted the credibility of the other witnesses on both sides of this dispute, we note that the witnesses who had the most contact with Dusenberry testified that they believed she was competent, including those witnesses outside of the family who did not stand to gain from the Second Trust. Sara Cox, a friend and former employee, spent every Wednesday with Dusenberry until she was admitted to the nursing home in December 1989. Cox witnessed the signing of the Second Trust. She stated that Dusenberry had good days and bad days, but that she would not have witnessed Dusenberry's signature unless Dusenberry understood what she was doing. Pat Lara was hired to take care of Dusenberry at night before Dusenberry suffered her strokes. She stated that Dusenberry "was a lady of her own mind" and "took care of her own things." Essie Arnold, a distant relative and friend, saw Dusenberry approximately twice a week and stated that Dusenberry's mind was still "sharp" before her strokes. Helen Dixon, also a friend and frequent visitor, stated that Dusenberry was still "sharp" and alert at ninety, although she occasionally had bad days.
In contrast to this testimony, the witnesses who testified Dusenberry was incompetent had considerably less contact with her. Hugh Macaulay, Jr., Dusenberry's nephew, saw her once a month. Rusty Depass, another of Dusenberry's nephews, saw her once every few months.[4] Kathryn DePass, *299 Dusenberry's niece, saw Dusenberry only two or three times a year.
We conclude that Drawdy's testimony does not support a determination Dusenberry was incompetent, and we conclude that the Respondents failed to carry the burden of proof on this issue.

II. Undue Influence
Appellants assert the trial court erred in ruling that the Second Trust and life insurance were procured through undue influence. We agree.
"[W]here a declaration of a trust is procured by undue influence it is invalid and unenforceable, but the influence exerted must be undue and operate to such a degree as to amount to coercion." Alexander v. Walden, 287 S.C. 126, 128, 337 S.E.2d 241, 243 (Ct.App.1985). The coercion must be "the kind of mental coercion which destroys the free agency of the creator of the trust and constrains him or her to do that which is against his or her will and what he or she would not have done if he or she had been left to his or her own judgment and volition." Id. at 128-29, 337 S.E.2d at 243; see 17A Am.Jur.2d. Contracts § 237 (1991) (stating that undue influence is "unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relation between them is justified in assuming that that person will not act in a manner inconsistent with his welfare."). "[B]y the very nature of the case, the evidence of undue influence will be mainly circumstantial. It is not usually exercised openly so it can be directly proved." Byrd v. Byrd, 279 S.C. 425, 427, 308 S.E.2d 788, 789 (1983).
Generally, the party challenging an instrument on the basis of undue influence must present evidence which "`unmistakenly and convincingly' shows the [party's] will was overborne by the [defendant] or someone acting on his behalf." Bullard v. Crawley, 294 S.C. 276, 280-81, 363 S.E.2d 897, 900 (1987) (quoting In re Will of Smoak, 286 S.C. 419, *300 424, 334 S.E.2d 806, 809 (1985).). However, the existence of a confidential relationship creates a presumption that the instrument is invalid, and the burden then shifts to the proponent of the instrument to affirmatively show the absence of undue influence. Id. at 280, 363 S.E.2d at 900; see Hembree v. Estate of Hembree, 311 S.C. 192, 196, 428 S.E.2d 3, 5 (Ct.App. 1993) ("In cases where allegations of undue influence have been successful, there has been evidence of threats, force, restricted visitation, or an existing fiduciary relationship.")
The probate court found that James MacLeod and Sara McLeod had a fiduciary relationship with Dusenberry through the power of attorney, and Appellants do not challenge this finding. However, there is strong evidence to show Dusenberry did exactly as she wanted with respect to her financial affairs and that Sara McLeod and James MacLeod lacked the ability to influence her when they wanted to do so. Under our view of the testimony, Appellants presented sufficient evidence to rebut a presumption of undue influence.
Drawdy testified and the probate court found that the McLeods were present whenever finances were discussed. However, neither Drawdy nor any of the Respondents were present when the life insurance policy was obtained or when the Second Trust was created and none of the Respondents had any personal knowledge concerning who was present during those occasions. In fact, Drawdy admittedly had very little contact with Dusenberry.
Jenkins, the insurance agent who obtained the policy, was a practicing attorney and magistrate for the State of Georgia at the time of trial. Jenkins denied witnessing any undue influence and stated that, to the contrary, he believed the policy was Dusenberry's idea. He noted she called him several times to check on his progress in procuring the policy. James MacLeod testified that he left Dusenberry alone to speak with Jenkins concerning the insurance policy. Jenkins also testified that he was alone with Dusenberry while discussing the life insurance policy and when she signed the application.
None of the Respondents alleged that they witnessed any instance of undue influence. Indeed, Hugh Macaulay, Jr. stated he was not asserting any undue influence, merely that Dusenberry was incompetent. Rusty DePass stated that he *301 had no evidence of threats or coercion used by Appellants and that he was not accusing them of threatening her. He deduced that undue influence had occurred because he reasoned Dusenberry would have never come up with the idea of establishing the Second Trust in that manner. Dusenberry's niece Kathryn DePass testified similarly.
Witnesses who saw Dusenberry on a frequent basis prior to her strokes stated that she was not mentally incapacitated and was not subject to undue influence. Sara Cox stated she never witnessed Sara McLeod or James MacLeod threaten or coerce Dusenberry and that Dusenberry was not someone who would respond to threats. Pat Lara painted Dusenberry as a very strong-willed woman who "was a woman of her own mind." She also stated that she never saw Sara McLeod or James MacLeod threaten or coerce Dusenberry and that "[y]ou couldn't make [Dusenberry] do something she didn't want to do." Essie Arnold concurred, testifying that she had never witnessed any coercion and that Dusenberry would not have responded to it.
The Appellants' inability to influence Dusenberry is further corroborated by Dusenberry's codicil executed in early August of the same year, close to the time when Dusenberry applied for the life insurance policy. The codicil altered her exercise of her power of appointment so as to give Sara McLeod or James MacLeod only the income from the marital trust, rather than 75% of the corpus. We think this change disproves any exertion of undue influence over Dusenberry.
The handling of the sale of Dusenberry's two hundred acre tract of land referred to as the Glassy Mountain property also weighs heavily in favor of the Appellants. The transaction took place, with the aid of Respondent Rusty DePass, after Dusenberry planned for the insurance policy and Second Trust. Appellants were not in favor of the sale because Dusenberry would incur a capital gains tax and the family would not receive the property at the stepped-up basis after Dusenberry's death. They refused Depass's request to execute the deed as attorneys in fact for Dusenberry, forcing the closing attorney to rely upon the efficacy of Dusenberry's signature. But the reticence of Sara McLeod and James MacLeod did not dissuade Dusenberry from consummating *302 the transaction. Despite James MacLeod's and Sara McLeod's objections, Dusenberry proceeded with the sale.
Based upon the evidence, we conclude the Appellants rebutted any presumption or evidence of undue influence.

CONCLUSION
For the foregoing reasons, the order of the probate court is
REVERSED.
CURETON and CONNOR, JJ., concur.
NOTES
[1] Although James MacLeod is the son of the late Sara McLeod and the brother of William McLeod, he spells his last name differently.
[2] Drawdy had further expressed concern over the fact that Dusenberry had insufficient liquid funds to cover the check she wrote to pay the insurance premium. However, Drawdy admitted that the bank had been copied with several letters concerning the transaction prior to the check being written. One such letter, dated March 30, 1989, almost a month prior to Dusenberry's check, refers to a conversation attorney Frank Holleman had with the "trust officer" wherein he was informed that the First Trust would not possess enough liquid funds to pay the premium until the following month. According to this letter, Drawdy was aware of the need for liquid funds to pay the insurance premium almost a month in advance and the letter indicates an understanding that the funds would be ready "sometime next month."
[3] We note that the First Trust was not a long established estate plan. Dusenberry's will and the First Trust were executed only a few months before she first applied for the life insurance policy. Dusenberry's only other will and trust in the record are documents executed in 1981 leaving the bulk of Dusenberry's estate to her husband.
[4] Rusty DePass's assertion that Dusenberry was incompetent at the time she initiated the irrevocable insurance trust is inconsistent with his actions in the ensuing months. DePass, a real estate broker, listed and sold a tract of land owned by Dusenberry known as the Glassy Mountain property, making a commission on the sale. Sara McLeod and James MacLeod had Dusenberry's power of attorney at the time. The closing attorney requested that DePass ask the McLeods to sign the deed, in addition to obtaining the signature of Dusenberry, simply to avoid any questions of competence. However, they declined to sign the deed, claiming the transaction was not financially sound because it created a capital gain for Dusenberry, lost the estate tax advantage of a stepped-up basis for her heirs, and served no useful purpose. Despite their refusal to sign the deed, DePass defended Dusenberry's competence, the closing took place, and DePass collected his commission.